SPRINGFIELD CRYSTALLIZED EGG COMPANY v. SPRINGFIELD ICE & REFRIGERATING COMPANY, Appellant.

Division One, June 30, 1914.

1. PLEADING: Bailment: Pleading Contract. Where plaintiff stored his goods in defendant's warehouse, and his suit is not on the contract of bailment, but *ex delicto* for damages for negligence, and the contract is pleaded somewhat by way of inducement, the petition must be judged from the angle that it sounds in tort with specifications of negligence.

2. ————: Negligence: Act of God: Concurrence. A petition which alleges that plaintiff stored its food goods in defendant's warehouse for hire, that an exceedingly heavy rain, continued through the greater part of eleven hours, fell in the regions round about, and in consequence the waters of a near-by river flooded the basement of the warehouse where the goods were stored, and that defendant knew of the danger, did not exercise reasonable care to prevent injury, did not move the goods to an unoccupied upper story when that could have been done with ordinary care, and that because of failure to exercise such care the goods were injured, does not on its face charge that the injury was the result of the act of God, but states a cause of action for negligence. It pleads that the proximate cause of the injury was defendant's negligence in failing to exercise due care in the presence of a threatening peril; and the law is that where such peril and defendant's negligence concur, defendant is liable.

3. **DEMURRER TO EVIDENCE: Substantial Evidence.** If the petition states a cause of action, and there is substantial evidence supporting all of its essential averments, a demurrer to the evidence should be overruled.

4. ————: ————: **Negligence: Matter of Law: Notice of Use.** Plaintiff placed its egg product in flour barrels about thirty inches in height, on which it placed a label specifying the product and conspicuously posted another label containing a legend in large red letters: "This package must be kept tightly covered and in a cool place," and stored the barrels in the basement of defendant's cold-storage warehouse for hire. A drain pipe ran from the basement to a sewer main imbedded in a river bed, the intake being 300 feet from the basement and about seven. feet below its floor. An unprecedented rain, lasting for seven hours almost without interruption, and then two or three hours later followed by a more rapid downpour for a half hour, flooded the streets and caused the river to overflow its banks and spread into adjoining streets, alarming men in the vicinity of the warehouse with fear for the safety of goods in basements. Between the time of the first long unprecedented rain and the subsequent deluge of shorter duration, inquiry was made (about six o'clock p. m.) of defendant's servant who usually received the goods, concerning the condition of the basement, and he expressed no fear, and gave no special directions to the night watchman who then came on duty, and who visited the basement only once during the night (about the time of the last deluge) and gave at the trial as his reason for only the one visit that he "didn't have to live in the basement." About seven next morning it was found that water had backed up the sewer pipe into the basement and had risen therein to a depth of three feet and the egg product in the barrels was ruined. There was ample room for all the barrels in the story above the basement, and a freight elevator between the two could have carried twelve barrels at each trip. No device had been installed to protect the basement from back water from the sewer. *Held*, that defendant had notice (1) that water would injure the egg product, (2) of the immutable laws of nature which drive water back through a sewer when there is a wall of water intercepting its outflow, and (3) warning of the unprecedented flood; that it did not exercise the due care to prevent injury to the egg product which the law imposes upon a bailee for hire; and the proof of its negligence was such that no court could say as a matter of law that it was not guilty of negligence directly contributing to the injury, and that being true the issue was one for the jury, under proper instructions.

5. ———: ———: ———: Contributory Negligence: After Injury. Things done or not done after the injury will not aid the defense of contributory negligence.

6. ———: ———: ———: Assumption of Risks. Plaintiff does not assume risks arising from defendant's negligence.

7. NEGLIGENCE: Instructions: Assuming and Ignoring Issuable Facts. The instructions given in this case did not assume that all the goods were damaged, did not ignore the evidence showing the damage was an act of God, did not ignore the manner in which the basement where the goods were stored was flooded, did not ignore the question of proximate cause, did not fail to define the measure of ordinary care under the circumstances, and did not ignore the duty of plaintiff arising from its acquiescence in the place of bailment, its knowledge of the danger to which the goods were exposed, and its knowledge of the ingredients and value of the goods; but are succinct, plain, fair and full.

8. PRINCIPAL AND AGENT: Subforeman: Negligence: Notice. Notice to defendant's subforeman, who had charge of the storage department and goods stored in defendant's warehouse, and conversations with him within the scope of his employment and pertaining to the goods stored, were competent to establish notice to defendant, in a suit against defendant for negligence in failing to take proper care to avoid injury to the stored goods at a time when they were endangered by an unprecedented rain.

9. BAILMENT: Drains: Notice. The warehouseman is chargeable with notice of the construction of drains from its basement to the sewer, through which back water entered and destroyed goods there stored, and also with notice of the absence of any device to keep out the back flow.

10. ORDINARY CARE: Definition. An instruction which defines ordinary care to mean "to anticipate what is reasonably probable to happen" should be refused, since the definition is not correct.

11. NEGLIGENCE: Anticipating Injury in Precise Way It Occurred. An instruction restricting the attention of the jury to the flooding of the basement in which plaintiff's goods were stored "as it was flooded," meaning thereby that unless the jury could find from the evidence that defendant could have anticipated the precise way in which the water got into the basement they should find for defendant, should be refused. The law is that if under all the circumstances defendant had notice of such a situation as would put a reasonably prudent man on guard to discover the entrance of water in any way,

and which would require him to take steps to remove the goods or otherwise save them from injury, the bailee is liable for the injury.

12. ————: **Assumption of Risk.** An instruction should not be given if there is no evidence to support it. If there is no evidence that plaintiff knew there was no device for keeping out the back water which entered the basement through the drain pipe or knew the grade above the basement and the main sewer, an instruction telling the jury that "if plaintiff had knowledge of the condition, structure and location of said basement at the time it placed its goods therein, plaintiff assumed all damages reasonably incident to such storage," should be refused. Besides, the bailor does not assume damages resulting from the bailee's negligence, and therefore the words "reasonably incident to such storage" are misleading.

13. ————: **Duty of Bailor to Exercise Care.** It is not the duty of the bailor, who for hire stores goods with a warehouseman having knowledge that they are liable to injury from exposure to filthy water, to take care of the goods, and to watch the effect of an unprecedented rain on the place of storage and to remove them therefrom on need of it.

14. ————: **Liability of Bailee: Knowledge of Character of Goods: Query.** ' If the bailor *alone* had knowledge of the character of the goods deposited with a warehouseman for hire and of its susceptibility to deterioration from exposure to filthy water, is the bailee liable for the injury to the goods caused by back water through a defective drain pipe. from the place of storage and for a failure to exercise reasonable care to remove them to a place of safety after knowledge of an unprecedented flood which caused the waters of a river to submerge the whole sewer system?

15. **APPEAL: Assignment Pretermitted in Brief.** If no stress is laid in the brief and argument on specifications in the assignment of errors, such pretermission is on appeal tantamount to an abandonment of them.

16. **EVIDENCE: Bailment: Means for Removal from Danger.** Evidence that there was a room above the basement in which the goods were stored for hire, that there was empty space in said room suitable for storing goods, and that there was a freight elevator connecting the basement and this room and usable by one man, is competent as a circumstance on the question of negligence, where the goods were permitted to remain in the basement during the nighttime after an unprecedented rain the previous day and early evening, which caused the waters of a near-by river to overflow its banks, submerge the sewer system and enter the basement, through

a failure to have a device at the entrance of the drain pipe to protect the basement from the flood of back water.

17. ———: ———: Impeachment of Product by Innuendo. Testimony of a man who once was a manufacturer of crystal-lized egg product, but who knew nothing of the character and quality of eggs used by plaintiff in producing his product, that the eggs generally used by such manufacturers are unmerchant-able or broken eggs, is not competent.

Appeal from Laclede Circuit Court.—*Hon. L. B. Woodside*, Judge.

AFFIRMED.

*Delaney & Delaney* and *Wm. H. Horine* for appellant.

(1) In this case, in stating the cause of action, plaintiff does not count on the bailment and ask judgment on the ground of non-delivery of goods on demand. This it could have done and could thus have imposed upon defendant the burden of showing that the damage was attributable solely to an act of God, or that it was not caused by any negligence of defendant. Per contra, the petition alleges specific acts of negligence. From such petition it also appears that this alleged negligence concurred with an act of God. Under such allegations, the burden is upon plaintiff to prove some act of negligence charged. It was not sufficient to prove bailment and non-return of property bailed. Nor does any inference of negligence arise from proof of such facts alone. An act of God concurring with negligence would not exonerate defendant, nor do we claim that it would. But we claim that the plaintiff must prove the negligence alleged. It is important to bear this in mind, as the instructions submitting the case to the jury must be predicated upon the issues tendered by the pleadings. Under the pleadings and the law, the defendant is only required to use ordinary care in the discharge of its duty to the plain-

tiff. It is a mere warehouseman for hire. On burden of proof, see Wolf v. Am. Ex. Co., 43 Mo. 421; Wiser v. Chesley, 53 Mo. 547; Davis v. Railroad, 89 Mo. 240; Turner v. Haar, 114 Mo. 345; Nichols v. Winfrey, 79 Mo. 545; Mill Co. v. Transit Co., 122 Mo. 275; Read v. Railroad, 60 Mo. 199; Otis v. Railroad, 112 Mo. 622; Gillespie v. Railroad, 6 Mo. App. 554; Hadley v. Orchard, 77 Mo. App. 141; Railroad v. Reeves, 10 Wall. 176; Walling v. Railroad, 101 Mo. 631; Brewing Assn. v. Talbot, 141 Mo. 679; Long v. Railroad, 14 L. R. A. (Pa.) 741. On degree of care, see, Tucker v. Barnett, 5 Mo. 97; Clark v. Railroad, 39 Mo. 184; Holzelaw v. Duff, 27 Mo. 392. On burden being on plaintiff when allegation is of concurring negligence with act of God, see, Turner v. Haar, 114 Mo. 335; Nichols v. Winfrey, 79 Mo. 545; Railroad v. Reeves, 10 Wall. (U. S.) 176. (2) Judged by this standard, that ordinary care only is required of defendant, and that it devolves upon the plaintiff to show that the injury was the result of negligence on the part of defendant, the verdict on the pleadings and on the undisputed evidence should have been for the defendant. The undisputed evidence taken as a whole shows: That the damage to plaintiff's goods is attributable solely to the act of God; that there was no concurring or intervening act of negligence on the part of the defendant; that the conduct of defendant was not the proximate cause of damage; that it was not negligence to fail to anticipate an act of God or its consequences. Under such conditions, the defendant is not liable. The damage was the result of an act of God without any intervening or concurring negligence by the defendant, because: The basement was not flooded from a usual or ordinary flood, nor from the usual and ordinary course of an extraordinary flood. The basement was flooded by an extraordinary and unusual flood, and was flooded in an unusual, unforeseen, unanticipated and inexplicable manner. From the facts in evidence there was nothing

to rouse a suspicion or justify a fear. Nor would any reasonably prudent man, with the same facts and conditions before him which confronted defendant, have anticipated a flooding of the basement or a flooding in the manner in which it was flooded. From the facts and circumstances presented to the vice-principal of the plaintiff, said plaintiff did not anticipate either a flooding or a flood in the manner in which it occurred. And surely if the conditions were not such as to arouse reasonable apprehensions of danger in his mind, by the same standard the alleged vice-principal of the defendant should be exonerated from the charge of negligence when his conduct is bottomed on the same facts. The petition charges that defendant received warning—presumably from the representatives of plaintiff, for their testimony on such alleged lines is all there is in the record to show such warning. As appears from such evidence, there was no warning in fact. But assuming that a warning was given, it was not incumbent on defendant's servants to remove the goods from the basement unless the appearances of danger were such as to arouse an apprehension in a reasonably prudent man. These apprehensions were not aroused in the mind of anybody representing either party at the time; and the fact that subsequent events show that there was a real danger ought not to establish negligence. (3) On the evidence adduced by plaintiff and on the whole case, a peremptory verdict should have been directed for defendant. The only apparent danger to plaintiff's goods was from an inundation of the defendant's basement from the overflow. A continued rise of surface water to such height that it would invade the basement through the windows or door or in some way from the surface reach the basement were the only things feared. With all the evidence before us we are still left to conjecture. We can only surmise how the basement was flooded, to-wit by the sewer system in some way becoming affected and thus caus-

ing a backing up of the sewer contents; or by pressure
through the seams of the cement floor. How the storm
produced this result is only a surmise. Surely one can-
not be held responsible for failure to reason out and
anticipate a result when, after the result is manifest,
it is still problematic how or why it occurred or what
produced it. Mischief which could not by the highest
degree of care have been foreseen surely cannot be
ground for legal liability when only ordinary care is
imposed.   The tests are: ''The result might have
been foreseen.''   ''What is probable must be consid-
ered; not what is possible.''   Clark v. Railroad, 39 Mo.
184; Balentine v. Railroad, 40 Mo. 491; Davis v. Rail-
way, 89 Mo. 340; Turner v. Haar, 114 Mo. 347; Mill Co.
v. Transit Co., 122 Mo. 278; Walling v. Railroad, 101
Mo. 631; Otis v. Railroad, 112 Mo. 622; Ellett v. Rail-
road, 76 Mo. 518; Flori v. St. Louis, 69 Mo. 341; Fuch
v. St. Louis, 167 Mo. 645; Sullivan v. Railroad, 133
Mo. 7; Coleman v. Railroad, 36 Mo. App. 476; Com.
Co. v. Railroad, 113 Mo. App. 547; Grier v. Terminal
Co., 108 Mo. App. 57; Holden v. Railroad, 108 Mo.
App. 675; Stone v. Railroad, 171 Mass. 536; Schaeffer
v. Railroad, 105 U. S. 249; St. Louis v. Ins. Co., 139
U. S. 237; Sutton v. Railroad, 66 N. Y. 243; Hubbel v.
Yonkers, 104 N. Y. 434; Loftus v. Ferry Co., 84 N. Y.
455; Marsh v. Chickering, 101 N. Y. 396; Beatty v.
Railroad, 58 Iowa, 242; Burke v. Witherbee, 98 N. Y.
562; City of Allegheny v. Zimmerman, 95 Pa. St. 287;
Ray on Neg. of Imposed Duties, pp. 133-134; Webb-
Pollock on Torts, pp. 45-46.   (4) The damage com-
plained of resulted from an act of God.   The defend-
ant was not required to anticipate such act, nor is it
required to anticipate the inexplicable and mysterious
ways in which He works His will.   Defendant was not
required to anticipate that the storm then raging would
continue until it became an unprecedented one, or
that it would in some inexplicable manner flood the
basement.   Nor, even in the face of the so-called warn-

ing, was defendant required to assume that the basement would be flooded other than in a natural way. Flori v. St. Louis, 69 Mo. 341; Ellett v. Railroad, 76 Mo. 518; Coleman v. Railroad, 36 Mo. App. 476; Smith v. Railroad, 11 L. R. A. (Ala.) 619; Long v. Railroad, 16 L. R. A. (Penn.) 741. (5) Under the law and the evidence the failure of defendant to remove the product from the basement is not a proximate cause of the injury complained of. At worst, it offered a mere occasion for the injury. In this case, under no reasoning, can such failure be deemed a proximate cause, if we bear in mind the real meaning of the term. The proximate cause in this case was: 1st, the act of God; 2nd, the said act of God manifesting itself in an inexplicable manner. The proximate cause is the efficient cause, the one that necessarily sets the other in motion. Aetna Ins. Co. v. Boon, 95 U. S. 117; Kappes v. Shoe Co., 116 Mo. App. 154; Brubaker v. Electric Co., 130 Mo. App. 439; Wilson v. Railroad, 129 Mo. App. 639. The practical construction of "proximate cause" is the cause which naturally led to, and which might have been expected to be directly· instrumental in producing the result. State v. Railroad, 52 N. H. 552; Topssham v. Lisbon, 65 Me. 449. In determining the proximate cause, the true rule is the damage must be the natural and probable consequence of the injury. Such as according to common experience is likely to· result or which in the course of events based on common experience might reasonably be anticipated. Hoadley v. Transp. Co., 115 Mass. 304; Derry v. Plilner, 118 Mass. 1131; Lane v. Atlantic Works, 111 Mass. 136. (6) The duty was imposed upon the bailor, the plaintiff, to care for the goods after the submersion. It and its officers had exclusive knowledge of the ingredients of the food product, had better and peculiar knowledge of the effect thereto from contact with water and was peculiarly in a position to care for the product after such contact. Under such circumstances the duty devolved

upon plaintiff to act, and if its negligent non-action either contributed to the original damage, or if such negligent non-action contributed to the increase of damage, it must bear the consequences of such action or non-action. These theories of defendant were entirely ignored as appears from the refusal of the court to give instructions 9, 10 and 11 submitting such issues to the jury. Hale on Bailments and Carriers, p. 67; Knowles v. Railroad, 38 Me. 55, 61 Am. Dec. 234; Finucane v. Small, 1 Esp..315; Schmidt v. Blood, 24 Am. Dec. 158; Parker v. Union Ice Co., 68 Am. Dec. 383; Smith v. Frost, 51 Ga. 336; Brown v. Hitchcock, 128 Vt. 452.

*Edgar P. Mann* and *Barbour & McDavid* for respondent.

(1)   The petition in this case states clearly and sufficiently a cause of action. Prince v. Compress Co., 112 Mo. App. 49; Johnson & Co. v. Ice & Refrigerator Co., 143 Mo. App. 441. And even though it be inartificially drawn, no objection having been made thereto by timely demurrer or motion, it will now, after verdict, be deemed sufficient. Thompson v. Linsey, 242 Mo. 72; Ice & Cold Storage Co. v. Kuhlmann, 238 Mo. 702; Johnson & Co. v. Ice & Refrigerator Co., 143 Mo. App. 441; Townsend v. Joplin, 139 Mo. App. 394; Haseltine v. Smith, 154 Mo. 404; Mason v. Stock Yards Co., 60 Mo. App. 97. (2)   There is no merit in appellant's contention that it is not bound by Grant Trammel's knowledge or notice, touching the value and character of goods bailed. These conversations were all had and this notice given and received in the usual course of business and about matters of which he had particular charge for his master. Bergeman v. Railroad, 104 Mo. 77; Johnson & Co. v. Ice & Refrigerator Co., 143 Mo. App. 441; McElvin v. Rail-

259 Mo.—43

road, 151 Mo. App. 143; Fowler v. Randall, 99 Mo.
App. 407; Mechem on Agency, sec. 721; State ex rel.
v. Sitlington, 51 Mo. App. 252; Hayward v. Insurance
Co., 52 Mo. 181; Kyle v. Gaffe, 105 Mo. App. 672. The
general rule is that the principal is charged with the
information of his agent and this is true whether the
agent discloses same or not; he is conclusively pre-
sumed to have done so and the master is bound there-
by. Cases cited above. This man Trammel received
the plaintiff's goods and all other goods which went
into that storage building and upon presentation of
receipts discharged them. He had other men working
under him. So much is clearly shown by the record
and is not denied. If at the beginning and the end
of the bailment he was in authority and had power to
bind this defendant, as he certainly did it will not now
be heard to say that, as to conversations with, or notice
to, him in the interim, particularly in respect of the
goods bailed, and here in controversy, he was not its
agent. Such a ruling would be intolerable. It has
always been the law in this State, that declarations
made by an officer, agent or employee and during the
transactions for which he is employed for his principal
and connected therewith are admissible. Investment
Co. v. Fillingham, 85 Mo. App. 534; Helm v. Railway,
98 Mo. App. 419; Jackson v. Schmid, 141 Mo. App.
229; Johnson & Co. v. Ice & Refrigerator Co., 143 Mo.
App. 441; Bergeman v. Railroad, 104 Mo. 86. Nor
was there error in admitting the testimony as to the
construction of the sewers in defendant's building.
This was a material fact and defendant will hardly be
permitted to escape liability on the ground that it did
not know anything about the construction of its own
building, or the sewer connections therewith. To ad-
mit that it did not know this, would be admitting the
grossest negligence on its part. (3) Even if the act
of God contributed to the injury and damage, yet un-
der the settled law in this State, found in a long line

of decisions, if the damage is the result of the concurring forces of defendant's negligence and some other force, for which it may not be responsible, including the act of God, then the defendant is still responsible if its negligence is one of the proximate causes of the injury. The facts shown in this record clearly call for the application of this rule. Benton v. St. Louis, 248 Mo. 110; Johnson & Co. v. Ice & Refrigerator Co., 143 Mo. App. 441; Realty Co. v. Railroad, 154 Mo. App. 378; Prince v. Compress Co., 112 Mo. App. 49; Davis v. Compress Co., 89 Mo. 340; Smith v. Fordyce, 190 Mo. 21; Newcome v. Railway, 169 Mo. 422; Warehouse Co. v. Railway, 124 Mo. App. 560; Pinkerton v. Railway, 117 Mo. App. 288; Commission Co. v. Railroad, 113 Mo. App. 544. And since defendant was negligent in the care of plaintiff's goods as the evidence here clearly shows, then, so long as it was negligent it is immaterial whether or not the injury complained of could have been anticipated by any reasonable man, or that it would not have occurred under common experience. Harrison v. Light Co., 195 Mo. 629; Hoepper v. Hotel Co., 142 Mo. 348; Benton v. St. Louis, 248 Mo. 110; Brash v. St. Louis, 161 Mo. 438; Mfg. Co. v. Railroad, 117 Mo. App. 459; Wolf v. Express Co., 43 Mo. 421; Grier v. Railroad, 108 Mo. App. 565. Defendant is liable if its negligence concurred with that of another or with the act of God, or with an inanimate cause, and became a part of the direct and proximate cause, although not the sole cause. Harrison v. Light Co., 195 Mo. 622. Negligence in the construction and in the care of the premises in which these goods were stored and in guarding against the flood and watching for the invasion of the water is shown in this case. The injuries resulting therefrom to plaintiff's goods were immediate and flowed directly from such negligent acts and the defendant, its agent and servants having been guilty thereof, it will not be excused for the reason that the particular consequences were unusual and

could not ordinarily have been foreseen. Benton v. St. Louis, 248 Mo. 110; Dean v. Railroad, 199 Mo. 411; Zeis v. Brewing Assn., 205 Mo. 651; Brady v. Railroad, 206 Mo. 537; Buckner v. Horse & Mule Co., 221 Mo. 710; Woodson v. Railroad, 224 Mo. 707; Graney v. Railroad, 140 Mo. 98; Harrison v. Light Co., 195 Mo. 629-630. (4) The nature of the commodity, the fact that it was a food product and that dampness or moisture would ruin it; that it was of great value, and that defendant's agents and servants had been warned and told thereof, were circumstances to be considered by the jury in determining the degree of care defendant should have exercised with reference thereto, what would have been deemed ordinary care in reference to lead, pig iron or other articles of commerce not easily injured by moisture or dampness would be gross negligence in reference to a product like that which plaintiff had stored with the defendant, which required great care and attention to protect it from moisture and ruin, and when plaintiff delivered the product to defendant it had a right to expect that defendant would deal with him in good faith and take reasonable care thereof, and defendant must answer for any loss that plaintiff has sustained for want of ordinary care on its part. Holtzclaw v. Duff, 27 Mo. 393; Quirk v. Elevator Co., 126 Mo. 294; Feddick v. Car Co., 125 Mo. App. 32; Railroad v. Ives, 144 U. S. 489. The controlling question in this case is not whether the defendant could control the rainfall, nor whether it could have prevented the water from entering the basement wherein these goods were stored. But the question is, and it is a proper one for a jury to determine, whether the defendant, knowing the character and value of the goods stored, knowing the construction of the basement of its building and of the sewer leading thereto, and knowing of the rainfall, and its effect on Jordan stream and valley, exercised ordinary care and watchfulness in not detecting the incoming flow of water and in not

removing the goods to a place of safety on the floor above, it being shown that the facilities were at hand (elevator and stairway) for such removal. Prince v. Compress Co., 112 Mo. App. 65. The fact that the effect in this case was somewhat unusual cannot defeat a recovery. Dean v. Railroad, 199 Mo. 411.

LAMM, J.—Plaintiff, a corporate manufacturer of hen's egg product, in 1905 stored the rise of two hundred barrels of it with defendant, a corporate warehouseman, as a bailee for hire at five cents a barrel per month. Water damaged the product in July, 1905. Thereat plaintiff sued in the Greene Circuit Court laying its damages at $18,611.46 for negligence. Presently plaintiff took a change of venue to the Webster Circuit Court. Presently defendant, in turn, took a change of venue to the Laclede Circuit Court. In that court plaintiff obtained a verdict of $12,000 in August, 1910. Failing to obtain a new trial on a timely motion, judgment followed. Failing to arrest the judgment on a timely motion, defendant on apt steps and in due time appealed.

Errors assigned are of a scope and character seeking a summary of facts, pleadings and instructions.

*The pleadings.*

After conventional allegations anent the incorporation of both parties under the laws of Missouri, the business of defendant as a public warehouseman for the storage of goods and products for hire, the storage by plaintiff of crystallized eggs at a stipulated hire of five cents per barrel per month, the value of the product, that it was of a character and nature making it necessary to keep it in a cool and dry place free from contact with water (and that water would ruin it), the knowledge of defendant of such facts, and the duty of defendant to use care and diligence in the premises, the petition complains of defendant as follows:

"Plaintiff further states that on or about the said 26th day of July, 1905, while its said goods were so stored with defendant, and kept by defendant in the basement of said warehouse, the basement of said warehouse containing said goods was flooded by water and said crystallized eggs of plaintiff came in contact and were saturated therewith and were greatly injured and damaged thereby; that defendant was warned of the danger and knew, or by the exercise of ordinary care and diligence in the discharge of its duties with respect to the storage of said eggs, could have known that its said basement, where the goods were kept, was flooded or being flooded with water and that said eggs were coming or liable to come in contact and be saturated therewith, in time to have removed the same to a place of safety and prevented the injury and damage aforesaid, which defendant by the exercise of ordinary care and diligence could have done and that said injury and damage to said crystallized eggs was caused by the negligence of defendant in the following particulars:

"1st. By its negligence in failing and refusing and neglecting to move said two hundred and thirty-nine barrels or any part thereof, containing said eggs, to an upper floor in said warehouse in a place of safety from said water, in which said upper floor there was then abundant room for said eggs, or to move same to some other place of safety, which defendant could have done after it knew of the imminent danger that threatened said eggs by the flow or accumulation of water in its said basement, by the exercise of ordinary and reasonable care and diligence in the conduct of its business.

"2nd. By its negligence in not removing said eggs from the basement of said warehouse to the upper floor thereof, where there was abundant room to store the same or to move the same to some more safe and suitable place during the long interval of time, amount-

ing to some seven or eight hours, which elapsed after said defendant received notice that the water was liable to invade its said basement, and destroy, injure or damage said eggs and before said damage was done.

"3rd. By its negligence in failing to provide and maintain a safe and suitable place to store said eggs, and by its failure to provide the room or place in which said goods were stored with proper safeguards to prevent surface water and other water from flowing into said place where the goods were stored as aforesaid."

The answer admitted defendant's incorporation and denied generally the other allegations of the petition. Following such general denial was a plea of assumption of risk, in that plaintiff at the time of the storage and long prior thereto had notice and knowledge of the character and construction of defendant's warehouse and of its location and surroundings "and by reason thereof assumed all risk incident to and flowing from such construction, location and surroundings." Following such plea was another in the nature of a defense of contributory negligence (or, *volenti non fit injuria*) in that plaintiff had knowledge of the character and constituents of the egg product described in the petition, but defendant had not; that after such product came in contact with water plaintiff could have avoided the injury and damage by reason of such knowledge but failed and neglected to properly care for said product, and the injury and damage suffered was due and owing to the failure and negligence of plaintiff to care for the product and not from its original cantact with water as alleged.

The reply put in issue the new matter in the answer.

*The facts.*

As the Arno splits Florence, even so Springfield is built on either side of a stream known locally as the "Jordan," which, like its sacred namesake, "swells its banks" now and then. This Jordan is either tributary

to or is the headwaters of a historical stream, Wilson's Creek. The locations and all regions round about referred to in this record, are in the valley and within the watershed of the Jordan. The lay of the land is such that the Jordan drains a large area, to-wit, part of Springfield and its surrounding country. Down this stream, sometimes in its channel and sometimes out, is the principal sewer of the city, a twenty-four inch main laid underneath the surface of the channel when in the channel. Defendant's plant, a large one of several departments, is devoted to the manufacturing of artificial ice and to cold storage and to warehousing purposes. At its nearest point it is, say, three hundred feet from the Jordan and the main sewer. Hard by the plant and running into the main sewer is a district sewer with an eight inch main. Running into this district sewer is a lateral or private sewer (hereinafter called a drain) with a six inch main draining defendant's basement where the egg product was stored. From the floor of this basement to the point where the main sewer intakes from the district sewer is a fall of six feet and three inches. Said private drain connecting the basement with the district sewer is the rise of one hundred feet in length. It leaves the district sewer with what is called a "slow" or "low" grade of about one-sixteenth of an inch. As it approaches the basement the grade is sharper, to-wit, about one-eighth of an inch. When this private drain was connected up with the district sewer it was found that the grade was so low that hot water from defendant's ice plant, entering the district sewer through another drain, followed in the drain towards the basement for fifty or sixty feet. From thence onward toward the basement the better grade stopped the back flow of water. There was no device in the basement to keep sewer backwater out of it. There was a device in the basement to keep out sewer gas, and this same device, a bell trap, was arranged to let water out of the

basement and keep it drained, as we gather, from water used in washing the basement, etc. Plaintiff was not advised of the sewer grades or connections, nor of said plan and method of draining the basement, nor of the omission of a device to keep out the back flow, as hereinbefore set forth. The plan of sewerage in Springfield is known as a "sanitary" or closed sewer, which (we understand) is a plan that did not contemplate taking in storm water or surface sewerage, or water descending through the downspouts of buildings. However, at the time in question the downspouts of defendant's large plant were connected with the sewer, but were, the year after the presently mentioned flood, disconnected. Defendant's basement had a floor of cinders topped off with concrete slabs of the usual character of concrete sidewalks. The walls were eighteen inches of stone laid on a stone footing course and plastered on the outside with concrete. On the inside of these stone walls was a two-inch layer of a material long in use for keeping out water, whereby the life of a great lawgiver was once saved when he was an infant and in peril from water (Ex. ii, 3, q. v.), to-wit, pitch, reinforced in this instance with rosin. Next to that was a nine or twelve-inch brick wall. There were two ways of taking goods into this basement— one, a stairway leading down from the upper floor; the other, a freight lift or elevator run by electricity. Defendant showed that this power was furnished by an independent company and that under the arrangement existing was usually shut off at midnight, but defendant made no effort to show that in an emergency the power might not be eked out on application. This elevator could carry at each trip twelve or more barrels of the egg product and in the storage room above the basement, at the times in hand, was ample space for it.

It seems that defendant's method of conducting its business on ordinary occasions was to close down

its warehouse department at about six p. m., and to leave, at least that part of its plant, in charge of only one person known as a "night watchman," one Henry Tingler. Tingler's ordinary duties were to see to it that an even temperature was kept in the refrigerating rooms above the basement where goods were in cold storage, and, as we understand it, he as part of his ordinary duties made a general round to see if all was well once each night, and this round included a visit to the basement. There is nothing to show that this particular plan of inspection and care was known to plaintiff. Plaintiff did know, however, that its property was stored in the basement, and we get the impression that the price of storage was higher in the refrigerating rooms above, and lower in the basement, and it appears that plaintiff contracted for the low price.

There is practically no dispute in the record but that the market price of plaintiff's product at Springfield (f. o. b.) was from forty-two to forty-eight cents per pound, depending on its grade. It was made of hens' eggs. In 1905 the price of eggs varied through the spring and summer. Hens living in a grain district lay eggs with more albumen and such are of more value than eggs from hens having no access to grain. So, April eggs have more nutrition than June and July eggs. So it seems (but this part of the record may be a mere cackle of State pride) an Arkansas hen does not lay as good an egg as a Missouri hen. It seems that by having reference to these conditions and its source of supply plaintiff's product varied in price as suggested. Plaintiff's egg product was produced by process of breaking the eggs, mixing them into a batter, spreading this batter on poplar boards and then driving over the mixture a current of air which took out the water, say seventy per cent of the total, and then thoroughly drying the residuum and grinding or breaking it into a flour or crystals. It was

then called crystallized egg and was put in flour barrels of about thirty inches in height, holding about two hundred pounds of dried and powdered egg. These barrels were lined with loose sheets of parafine paper intended to protect the product from dust and ordinary moisture from the air. On each barrel was a tag or label specifying the contents and the "brand under which we were selling it." There was also a label, containing a legend in large red letters, to-wit: *"This package must be kept tightly covered and in a cool dry place,"* conspicuously posted on each barrel. On this record crystallized egg was not used in Missouri, but was shipped to Boston, Alaska and New York (where presumably hens are scarce and egg-hunger abounds) and was purchased by restaurants. It is made ready for use in cakes, custards, crullers, and edibles of that ilk, by adding seventy per cent water (the same amount evaporated in the drying process) and then used *ad lib.* or per favorite recipe, we infer.

Defendant had in its employ a man who had charge of this storage department, one Grant Trammel. He testified for defendant and calls himself "receiving clerk at the cold storage plant." He says his duties were "to receive stuff, check the things in and out, and [he says] I attended to those duties." He had men working under him. Plaintiff had stored with defendant egg products at times not involved in this suit, and, in regard to that product and to this in question, plaintiff only came in contact with Mr. Trammel as the sole person in charge for defendant. Trammel issued drayage tickets or receiving receipts and accepted and supervised the storage of the goods for defendant. When goods were called for, to be taken out, those receipts would be presented to Trammel and he took them up for defendant on delivery by him of the full amount named in the ticket, or credited on the ticket a partial delivery, as the case might be. In a considerable course of dealings between plaintiff and

defendant (outside of the original contract for a storage rate, which was made with the general manager) plaintiff came in contact with no one else except Trammel and his men. In fine, the testimony indicates he was a foreman under the general manager, Meyer. There is practically no dispute but that prior to July 26, 1905, and covering a period of several months, defendant through Trammel received the rise of two hundred barrels of plaintiff's product on storage, packed in barrels, labelled as stated.

On July 26, 1905, commencing in the morning at about ten o'clock, there was a great rain in Springfield and in the valley of the Jordan and adjacent regions. Since that time there has been one heavier downpour, but for twenty-five years before that time there had been no record of such a great rain. The water on the streets in the afternoon is spoken of as a "flood sheet." The rain is spoken of as "unprecedented." The Springfield Court of Appeals on the same facts (143 Mo. App. l. c. 449) speaks of it as "torrential." If dignified judicial exposition ever tolerates the similitudes of the firesides of plain folk, the rain may be described as something more than a "gully-washer" or "trash collector," but something less than a cloudburst or a water spout. A block or so away from defendant's plant lies the Frisco passenger depot, and in the afternoon passengers were carried from and to the cars at that depot in railway trucks. One witness speaks of the downpour at one time in the afternoon as carrying everything before it on the street. This rain was a seven-hour continuous downpour, to-wit, from ten a. m. to five or five-thirty in the afternoon. It then slacked up and the waters on the street receded a bit. However, there was testimony that at six p. m. there was another heavy rain in the valley and city, but whether that six p. m. cloud overhung defendant's plant is not so clear. However, commencing again at about eight and a half p. m. the heaviest down-

pour of all occurred, lasting for a half hour or so. The record shows that during the afternoon of that day men in business in the neighborhood of defendant's plant became alarmed about the safety of goods stored in their basements and kept a watch and took precautions. The Jordan swelled beyond its banks. The closest manhole in the main sewer was under water. Plaintiff offered to prove that other business men whose houses were in the immediate neighborhood elevated their goods from their basements in the afternoon, but this evidence was rejected. One of plaintiff's officers was at defendant's plant a little before six p. m. and made a delivery of eggs in the shell. The water situation was the subject of conversation between him Trammel. It was so threatening that such officer inquired of him about the safety of the basement. He was assured there was no danger. On being pressed, however, on the ground of his solicitude, he admitted he did not have in mind backwater from the sewer but was afraid of surface water. Sometime before that one of plaintiff's officers had discovered a little water in the basement. It seems to have got in either by seepage or from condensation from a coil pipe and amounted to little. Solicitude was expresed to Mr. Trammel at that time about moisture in the basement, but the conversation is of no significance except in the line of notice of the bad effect of water on the product. There was no water in the basement when the storage plant closed down at six p. m. and at that time defendant's agent, Trammel, up to then in charge, left the building, and the night-watchman assumed charge. Trammel does not appear to have given any special directions to the watchman or to have taken any precautions against the flood. The basement had remained dry up to that time and he supposed it would withstand this high water. This watchman, so left in charge, visited the basement, so he says, at nine p. m. (about the time the last deluge ceased) and found

no water. Though about that time was the worst rain of all the day, yet that was the last and only trip he made to the basement and that visit and this one watchman were the only steps defendant took to spy out conditions, or protect the product from high water. The watchman's idea of his duty and his reason for making only one visit was that he "didn't have to live in the basement." The next morning at seven a. m. about three feet of filthy water were found in the basement. Some fifteen barrels of the stored product piled in an upper tier were found undamaged. From the core of some other barrels plaintiff saved, fit for human use, enough to make twenty-three smaller barrels when repacked. The rest of it was ruined—remained with defendant and was eventually fed to hogs. Water was found in many basements in the neighborhood in the morning and the city sent an engine to help pump it out. Defendant and plaintiff entered into an agreement relating to salvage, neither side waiving or admitting liability, and an attempt was made to stop the further penetrating effect of the water by freezing the product, but there is substantial evidence it was unavailing and the loss was as stated.

Defendant put in proof tending to show that after the 1905 disaster it put in a device or "plug" to keep out the back flow of sewer water, that finally there came a greater flood a bit before the trial, and, with this plug in, the water burst into the basement through the seams of the cement floor.

The tendency of the proof was to show that plaintiff was practically ruined by its loss and its owners eventually were set afoot.

Other goods were damaged in the basement and defendant's liability on substantially the same facts was adjudged in a case found reported in the 143 Mo. App. 441 (Johnson & Co. v. Springfield Ice, etc., Co.).

Defendant's counsel made objections to the introduction of testimony on the part of plaintiff which

seek more of the testimony, when those objections are under review in the course of the opinion. Any other facts necessary to an understanding and disposition of assignments of error will appear in connection with a discussion of those assignments.

*The instructions.*

The case was put to the jury on behalf of plaintiff in the following instructions:

"1. The court instructs the jury that if you find and believe from the evidence that on and prior to the 26th day of July, 1905, defendant was engaged in operating a warehouse in the city of Springfield, Missouri, and storing goods for hire and that while so engaged prior to and on said date plaintiff had stored in defendant's said warehouse for safekeeping two hundred and thirty-nine barrels of crystallized eggs upon which it was to pay storage of five cents per barrel, per month, and that while said eggs were so stored by defendant, the basement or room in which they were stored was flooded with water which came in contact with said eggs and damaged them, and that defendant, its agents or servants in charge of said warehouse, knew that water by coming in contact with said eggs would damage or ruin them; and if you further find from the evidence that during said 26th day of July, 1905, a heavy and extraordinary rainfall at said place produced a great flood of water, which caused said basement or room where said eggs were stored, to be in danger of becoming flooded with water and said eggs to be in danger of coming in contact therewith, and that defendants or its agents and servants were warned or knew of said danger, or, if you find from the evidence that they could have known thereof by the exercise of ordinary care on their part and that defendant could have then by the exercise of ordinary care and diligence removed said eggs to a place of

safety and prevented said injury or damage to them and failed to do so, and that by reason of said negligence and failure of the defendant said eggs became damaged or ruined, your verdict should be for the plaintiff.

"2. The court instructs the jury that if you find in favor of the plaintiff your verdict should be for the difference between the reasonable market value of the crystallized eggs stored by the plaintiff with the defendant in the damaged condition on the date of the damage and the reasonable market value thereof at the time, if they had not been damaged, and you are further instructed that if you find from the evidence that any of such crystalilzed eggs were totally ruined, then your verdict should be for such sum as you shall believe from the evidence was the reasonable market value of such crystallized eggs at the time they were so ruined.

"3. The jury are instructed that ordinary care, effort and diligence as the terms are used in these instructions mean such care, effort and diligence as a person of ordinary sense or prudence engaged in the same business or similar business might reasonably be expected to use under the same or similar circumstances.

"Nine of your number concurring," etc.

It was put to the jury on defendant's behalf in the following instructions:

"1. The court instructs the jury that from the evidence the defendant would not be liable to the plaintiff for any damage for the food stored with the defendant unless it was guilty of negligence with respect to said property, and plaintiff cannot recover unless it has shown:

"First, that at the time complained of there was an extraordinary and unusual rainfall in the vicinity of its storage building;

"Second, that the defendant knew or by the exercise of reasonable care and caution would have known that there was danger that such rainfall would cause water to enter into its basement and damage said goods;

"Third, that after knowledge of such danger or by the exercise of reasonable care and caution it would have known of such danger, it could by the exercise of reasonable diligence have removed said goods to a place of safety and prevented damages.

"It devolves upon the plaintiff to establish these facts by a preponderance of the evidence.

"2. A preponderance of the evidence does not mean by a greater number of witnesses, but that the evidence introduced to establish such facts must be stronger and more convincing than the evidence to the contrary.

"3. Ordinary care, foresight and diligence as the terms are used in these instructions mean such foresight and diligence as a person of ordinary sense or prudence engaged in the same business or similar business might reasonably be expected to use under the same or similar circumstances.

"4. In determining the question as to whether or not the omission of the defendant to remove said goods from the basement was negligence you should take into consideration all the facts and circumstances in evidence. The mere fact that the basement was flooded and the goods damaged thereby are not sufficient to establish such negligence, but it devolves upon the plaintiff to further show that after such rainfall the defendant knew or by the exercise of reasonable care and caution would have known that there was danger of water entering into said basement and causing damage to said goods.

"5. You are instructed that statements of counsel and offers by counsel to prove certain facts are not

evidence and should not be considered by you in reaching a verdict in this case.''

Defendant prayed and was refused twelve instructions, which, so far as necessary, will be noticed in the course of the opinion.

I.  *Of the sufficiency of the petition.*

Defendant, objecting to the introduction of any testimony on a conventional ground and the court overruling the same, on exception saved to that ruling, assigns error. The point is made that on its face the petition shows the damage sprang from that form of *vis major* or *vis divina* called in the books ''an act of God'' by way of figure of speech.

That ruling we think flawless. True, as argued, plaintiff is not suing strictly *ex contractu—i. e.*, on the contract of bailment. He does not stand on that contract and by pleading a delivery of the goods, demand of redelivery, tender of the storage price and a failure to redeliver, assert the contract was breached, whereby the burden of justifying and excusing non-delivery might rest on the bailee. *Contra,* the suit is *ex delicto* for damages for negligence, plaintiff holds the laboring oar, and the contract is pleaded somewhat by way of inducement. Hence the petition must be judged of from the angle that it sounds in tort with specifications of negligence. In that view of it the vigor and long continuance of the tremendous rain are pleaded by way of environment, a condition of things, and a warning notice to defendant of reasonable danger to be apprehended from the insidious encroachment of water, which due care could and should guard against. Now, due care is a care shifting up or down with circumstances. Due care rises or sinks with the gauge of danger and with the quality of the thing to be taken care of. It is folly to expect the same care to be taken of a brick as of a watch. With reference to water, it would be folly to expect the same care to be taken of a

box of sponges as of a barrel of food product. So, the care due on a calm, settled day is not the care required in tempestuous weather when extraordinary perils thicken and threaten. In this case the extraordinary downpour lasting with brief intervals from ten in the morning until nine at night, may be allowed as an act of God in a sense contributing to the damage, but the petition alleges specified negligences of the defendant as proximate causes of the injury, as elements directly contributing with the other to the loss. We shall recur to the facts in considering the demurrers to the evidence presently. For the present it will do to say that the gravamen of the charge in the petition is to the effect that having charge of the goods for hire, defendant in the presence of threatening peril did not come up to the mark of due care and that had its duty been done the loss would not have happened. The gist of the charge relates to a failure to watch out for the insidious and naturally-to-be-expected approach of the water and the failure to lift the goods to the floor above on its appearance. This is not a case where a dyke was unexpectedly broken by the onrush of a flood or a building collapsed from a great storm and damage resulted. In such a case the *vis divina* is deemed the be-all and end-all of the matter—the sole producing cause, hence the calamity is taken as a common and unpreventable one in the eye of the law, and he who suffers the loss must bear the loss. Cases of that character do not run on all-fours with this.

It is uniformly considered good doctrine that if A and B negligently injure C in person or property, C may recover from one or both. If, now, B happens to be an inanimate thing, a force like the act of God, then C may still recover against A if his negligent act was so mixed with the act of God as a proximate cause of the damage, that it would not have resulted if due care had been exercised by A.

Johnson and others owned some of this food product, and suffering loss by the same flood, sued and recovered. The judgment was affirmed by the Springfield Court of Appeals, 143 Mo. App. 441. The facts were not dissimilar to those now in judgment and the law of the case is there well dealt with and announced in the particulars now in hand. [Moffatt Com. Co. v. Railroad, 113 Mo. App. 544; Gratiot St. W. Co. v. Railroad, 124 Mo. App. 545.]

In Benton v. St. Louis, 248 Mo. l. c. 111, the following apposite pronouncement was made:

"There is no bone to be picked in a forum of reason with the abstract proposition that liability cannot be predicated of an injury resulting alone from the act of God, say, a bolt of lightning, a cyclone, a cloudburst, an earthquake. Nor can actionable damages be predicated of an injury entirely disconnected in cause and effect from the concurrent negligence of defendant and solely referable to any other form of *vis major* or *vis divina*. But the vice in the instruction is that it is not applicable to the facts of this record. Here there were acts of negligence on the part of the city commingling with the heavy rainfall and the condition resulting from this commingling of negligence and storm caused the death of George Benton. On principle it must be apparent where there is negligence which contributes as one proximate cause to the injury, which injury would not have resulted from the act of God, or from some chance case (*vel causus fortuitus*), except for defendant's negligence thereto contributing, defendant is liable. [Brash v. St. Louis, 161 Mo. l. c. 437 et seq., and cases cited; Woods v. Kansas City, 58 Mo. App. 272; Bassett v. St. Joseph, 53 Mo. 290; Lore v. Am. Mfg. Co., 160 Mo. l. c. 626; Vogelgesang v. St. Louis, 139 Mo. l. c. 136.]"

It must be held that the petition stated a cause of action.

II.   *Of demurrers to the evidence.*

At the close of plaintiff's evidence in chief defendant unsuccessfully demurred to the evidence.   At the close of the whole case defendant, by a mandatory instruction asked and refused, again challenged the sufficiency of the whole proof, and now assigns error on both rulings.   Allied in scope, they may be considered together.   We think them well disposed of below, because:   It must be allowed on this record that plaintiff put in substantial proof on the averments of its petition.   If the petition be sufficient to state a cause of action, as we have just ruled, and if it must be allowed (as we have just held) that there was substantial evidence sustaining the averments, then the conclusion is inevitable that a case was made for the jury.   In that view of it there could be no error in letting it go to the jury.   This defendant (assuming for the purposes of the present point that the proof was competent) had notice of the sensitiveness of the stored food product to damage by water and to be ruined by filthy water. Common sense teaches so much, when, as here, it knew the nature of the product.   Besides, every barrel carried a red letter notice of danger from water and appealed to the bailee for protection.   The means of preserving it from water by ordinary care were at hand, if used.   On the facts here, it must be held to have notice that it had installed no device to protect the basement from backwater from the sewer.   It must be held that to have notice of those immutable laws of nature which drive water back through a sewer when there is a wall of water intercepting its outflow.   Even a boy knows that when the great stream is at a flood, the little one running into it swells with backwater and seeks every available outlet.     Sewers are but closed streams and obey the same natural laws.   So, defendant had warning of the unprecedented rain, the flooded streets, the bursted banks of Jordan, that water was

everywhere and must seek its level, according to its own law, and to do so would search every nook, crevice and cranny, even to run *up* a sewer into a connected basement. The insidious encroachment of water upon basements and into them, under such circumstances, is well known and within the pale of reasonable probability. So the danger was common to the vicinity and manifest to all. Natural and widespread solicitude existed, was apparent and was brought home to defendant in the afternoon. It complacently shut up its storage department in the evening as if no watchfulness was expected of it. It left no orders for any lookout at all commensurate with the extraordinary circumstances. It relied on the stale custom of one visit of inspection by its night watchman. It relied on a watchman whose sense of duty in the crying situation contented him with the one usual visit and who repelled the idea of any more or any other inspection with the naive suggestion that he "didn't have to live in the basement." It was indeed a case of like master like man. As noticed by the Springfield Court of Appeals (reproducing the just though sprightly observations of plaintiff's counsel) : "They didn't even devote as much time, attention or care to these goods, of this great value and of extreme susceptibility to destruction by moisture, as the ordinary farmer's wife devotes to her hen and chickens in the ordinary rain." In my judgment the proof is of such character that no court ought to say as a matter of law that ordinary, prudent persons assuming for pay the care of goods of such character (that is, in like circumstances and in the like business) would have acted as defendant did. We cannot say that reasonable minds would not differ on that nor that there were no two ways about it. Hence the clear applicable rule of law is (not, as asserted by appellant, that there was no negligence on its part causing the damage as a matter of law, but) that the issue was for the jury, and that the real judicial question

shifts and comes to be: Was it properly put to the jury in competent evidence and in proper declarations of law?

Some further observations on this head are not afield, to-wit: The answer counted on assumption of risk and contributory negligence as defenses. But the proof put in on that behalf by appellant, if any, is not of a character allowing the case to break on demurrer. In fact, without going into details, we see no contributory negligence on the part of plaintiff in dealing with the product *after* the flood, and that is the precise place and time the shoe on contributory negligence is said to pinch. Both sides did the best they knew or could in the morning, but the die was cast, the problem was then insoluble, the ill then past all cure— you can't make bad eggs good. When a dirty sewerage has once come in contact with a dried egg product designed for human use, has this court any call to higgle over the question of making that contaminated sometime food fit for cakes and custards? We hear none; we see none. By agreement, both parties tried freezing and—then hogs. The last was a happy stroke, the fittest of the twain; for we have no hesitation in holding that all eggs are eggs to that four-footed eater, whose appetite runs to quantity more than delicacy of taste, so far as we stand advised.

The law of assumption of risk in this jurisdiction excludes the assumption of risks arising from defendant's negligence and since in the case at bar if there was no such negligence there was no case at all, it is not clear what we have to do with assumption of risks on demurrer.

Both demurrers were well ruled.

III. *Of the instructions.*

(a) Plaintiff's instructions are criticised on the following grounds;

"1st. Nos. 1 and 2 assume that all of the goods were damaged. This was a distinct issue in the case.

"2nd. Said instructions ignored entirely the evidence showing the damage to have been an act of God and entirely ignored the manner in which the basement was flooded; and entirely ignored the question of proximate cause and entirely omitted to define the measure of ordinary care under the circumstances of the case.

"3rd. Said instructions absolutely ignored the question of the duty of plaintiff arising from its acquiescence in the place of bailment, its assumed knowledge of the danger to which the goods were exposed and its exclusive knowledge of the ingredients and value of the property."

When these instructions (q. v.) are laid side by side with the criticisms, we look in vain for sound matter in the latter. Neither *ore tenus* nor in printed argument was there any evolution of the quoted criticisms demanding observations beyond this, to-wit, those instructions, when fairly construed, are their own best answer to the shafts of criticism levelled at them. They were succinct and pithy, but plain, fair and full. They deserve praise, not blame, from the court. The point is disallowed to defendant.

(b) Defendant complains of the refusal of twelve instructions. Attend to them.

(1) Of those refused number one is the mandatory instruction.

Number three was also in effect a mandatory instruction and therefore properly disallowed.

(2) Number six was in the same class in part. Ignoring the issue of negligence it declared as a matter of law that the damage was caused by the act of God. Having taken that stand the instruction at great length then goes on with animation and a palpable smack of argumentation in defendant's behalf to explain the negligence counted on in the petition, what is meant by ordinary care, the burden of proof and

the preponderance or greater weight of the evidence. In so far as it properly defines "ordinary care" and "preponderance of evidence" those questions are fully covered by other given instructions. There was no error in refusing it.

(3) Number four (*Nota bene*: Defendant had two number fours—one given) restricts the recovery to nominal damages on the theory there was no evidence of the market value of the goods. The fact being *contra,* the instruction was bad.

(4)   Numbers two and five withdrew from the jury the conversations with, and the declarations of, Grant Trammel. This on the theory they were not binding on defendant. They also withdrew from the jury the evidence of a certain witness, Shields, on the construction of the drain for the basement and the back flow of water therein at that time. We have heretofore pointed out that Trammel was defendant's subforeman under Meyer, its general manager, and had charge of the storage department and stored goods. Notice to him and conversations with him within the scope of his employment and pertaining to the goods stored, while in the course of the storage and according to the usual course of business, as here, were competent.

So, defendant stands charged with notice of the construction of its own drains at a low grade and the absence of any device to keep out back flow from sewers. How the water got in was a legitimate subject of inquiry. The low grade was germane to that inquiry. Hence, on either ground the court did right in refusing to take from the jury the evidence of Shields as well as the conversations with and declarations of Trammel.

(5) Having already received an instruction (hereinbefore copied, to-wit, one given and numbered four, *q. v.*) defendant asked the following:

"7. In determining the question of negligence or no negligence you are further instructed not to consider what did happen or what was possible to happen, but what was probable to happen from such a storm as ordinary care means to anticipate what is reasonably probable to happen.

"You are therefore admonished that the fact that the basement was flooded as it was is no evidence whatever of negligence and is no evidence whatever that the defendant should have reasonably anticipated such flooding; nor is the fact that the property was damaged evidence of negligence, nor should such fact be considered by you in determining the question of what a reasonably prudent man would anticipate as a probable result of the storm."

It will be observed that the last paragraph of refused instruction seven is but a paraphrase of defendant's instruction four given on its own prayer. In its first paragraph it hazards giving the meaning of "ordinary care" to be "to anticipate what is reasonably probable to happen." We know of no such definition of "ordinary care" as that, and since *ordinary care* was properly defined in other definitions given at defendant's request there was no error in refusing the instruction.

(6) Instructions eight, nine, ten, eleven and twelve were also properly refused. Number eight restricts the attention of the jury to the flooding of the basement in a certain way, to-wit, "as it was flooded," meaning thereby that unless the jury could find under the evidence that defendant could anticipate the *precise way* the water got into the cellar, they should find for defendant. Clearly that was not the law. If under all the circumstances (to-wit, from the prolonged rain, the downspouts connecting themselves with the drain, the low sewer grade, the enormous volume of surface water, the high stream, the absence of all protecting de-

vices against back flow, the water soaked earth) defendant had notice of such a situation as would put a reasonably prudent person on guard to discover the entrance of water in *any* way, and required it to take steps to remove the goods, then it ought to be held liable.

Instruction nine runs on the theory of assumption of risk on the part of plaintiff and its contributory negligence. Now, there is not a vestige of testimony, as we read this record, showing plaintiff guilty of contributory negligence after the flood. So, that part of the instruction directed to assumption of risk, if proper in any case, was not proper in this case. It reads: "So you are instructed that if plaintiff through its officers had knowledge of the condition, structure and location of said basement at the time it placed its goods therein, plaintiff assumed all damages reasonably incident to such storage." If by that instruction it was meant that if plaintiff knew there was no device for keeping out backwater, knew of the low grade from the district sewer, knew the grade from the basement floor above the main sewer, etc., such knowledge impaired the right to recover, then it is not based on the evidence. So, the instruction proceeds on the assumption that defendant was relieved of all duty to use ordinary care under the extraordinary circumstances of the case in watching for the encroachment of water and in removing the goods on the appearance of danger. Otherwise put, it assumed defendant's negligence was "reasonably incident" to a bailment in a basement. Is that not plaintiff's assuming the risk of defendant's negligence in the teeth of the law as we always write it? Clearly, if given, it would have misled the jury by turning their attention away from the real issue, to-wit, defendant's own negligence.

Instruction ten has the same vice as number eight, and without any evidence of plaintiff's contributory

negligence in the matter of reclaiming the goods and minimizing the damages, put that issue also to the jury.

Instructions nine and eleven had like vices. They furthermore put the boot on the wrong foot. They, in effect, made it the duty of plaintiff to take care of the goods, to watch the effects of the storm on the basement and remove the goods from the basement on need of it, despite the fact that defendant admitted itself to be a bailee for hire, precisely as charged and proved. That proposition is a somewhat novel and anxious addition to the conventional law of bailments, and to the duties of the bailor. We cannot approve of it as now advised, but dismiss it with this suggestion: If that view be ever adopted, then another question springs, to-wit: Will a bailor also be held guilty of negligence in not watching out for the bailee's negligence and in not intercepting its effect? Up to this time there as been no general doctrine known to us requiring A to act on the theory that B, who owes him a duty, will be remiss or negligent in the performance of it. The general acceptable doctrine runs the other way. [Crawford v. Stockyards Co., 215 Mo. 394.] 'Tis well to consider the end on that road before we set out.

Because of a contention made by defendant's learned counsel in this connection, we make this observation: If the bailor alone had knowledge of the character of its egg product and its susceptibility to deterioration from exposure to filthy water and of the necessity of keeping it dry, another question might be here—one not here on this record, and on which we say nothing at this time.

The premises all in mind, we find no error in refusing defendant's instructions; and this brings us to the final question in the case we take next under the head:

IV. *Of rulings, nisi, on the admission and exclusion of evidence.*

Under the head of "assignment of errors," defendant specifies many. However, in its brief and argument it lays no stress on some of those specifications. In this court, under recognized practice, such pretermission is tantamount to their abandonment as reversible error. We need consider only those brought forward as live matter in the brief, the others not being worth while.

(a)  Of the admission of evidence.

(1)  On the theory that the proof shows Grant Trammel was not the agent or foreman of defendant in charge of the storage department, it is contended that conversations with him and statements made by him during the course of the storage and pertaining to it were not binding on defendant and that notice to Trammel (for instance, of danger) was not notice to defendant. The ruling hereinbefore made on defendant's refused instructions, seeking to take that evidence from the jury, disposes of the point adversely to defendant.

In this connection a subsidiary point is somewhat faintly made, to-wit, that evidence was erroneously admitted tending to show there was a room above the basement with empty space suitable for storing goods and a freight elevator operated by electric power connecting the basement with this room and usable by one man. We see no error in admitting that testimony. Its tendency was to show means at hand and ready for use to prevent damage by water. It was pertinent on the question of negligence. Defendant warmly maintains the theory that the burden was on plaintiff to show negligence. So it was, under the allegations of the petition and the form of the action. Now, take a case: If the goods, with the permission and procurement of plaintiff and because of the low rate, had been

stored in a basement having no elevator and in a building having no other room fit to remove them to, would not defendant be entitled to show that fact as a circumstance on the question of negligence? We rule the proof competent.

(2) It is next argued that the testimony of plaintiff's witness, Shields, descriptive of the low grade of the basement drain from where it connected with the district sewer up to its connection with the basement floor, was incompetent. That identical question was necessarily held in judgment in the ruling on defendant's instruction having for its office taking such testimony from the jury. When we held that instruction properly refused, as we did, it was tantamount to a disallowance of the present point.

(b) Of the exclusion of testimony offered by defendant.

In its brief defendant makes the following point in the following words: "The court erred in excluding the testimony of the witnesses McCann and McDaniel, because such testimony affected directly the issue on the measure of damages."

Turning to the record to, catch the application of the contention, we find defendant put on the stand a Mr. McCann. It seems he was a present tobacconist, but a sometime manufacturer of crystallized eggs. He was never connected with plaintiff company and was not familiar with its methods of manufacture or the character and quality of the eggs used by plaintiff in its product. Despite his knowing nothing about plaintiff's plant or the quality of the eggs used, defendant sought to show by him that the eggs *generally* used by such manufacturers were not merchantable hens' eggs or even second class eggs, but that such manufacturers generally search out unfortunate eggs, unmerchantable and broken eggs. The court (having first ascertained by inquiry of that witness that the offered testimony did not relate to plaintiff's product, but re-

ferred to the casual knowledge of witness acquired when he was in that line himself and before he went into the tobacco line) excluded his testimony. We think rightly so. Plaintiff's actual damages could not be minimized by hooting away the quality of its eggs by *innuendo*. The food egg has troubles enough of its own without adding to the list by imagination.

Mr. McDaniel was a banker and owned hogs. He got from defendant, to feed to his hogs, what was left of the stored egg product after the flood and after plaintiff had rescued all of it it deemed fit for human use. The record shows that while on the stand for defendant a leading question was asked him. It was excluded and he was allowed to answer a proper one. He was allowed to describe the condition of the product in his barrels. His description was to the effect that the product in the center of the barrel differed from that coming in contact with the staves. "The outside was a kind of paste, but the inside was granulated. On some, paste was thicker than on others. The general average I would judge about one and one-half inches." He was allowed to explain what he meant by "granulated" and said he never had seen any crystallized eggs except in those barrels. Some of the barrels had been opened and some not, some were full and others not. Finally he was asked this question: "Do you know the appearance of those barrels you speak of that hadn't been opened was different from the ones that had been opened?" On objection he was not allowed to answer that question, and we take it there is where the alleged error supposably lurks. There was no tender of any proof at the time. He was allowed to tell what he saw and to describe the contents of the barrels and if he had answered the question asked and had said there *was* a difference, then, in order to make anything of his testimony, the next and vital question must have been: In what did that

difference consist? As to that we say: *The facts were already before the jury.*

From the conclusions announced it appears that on a good petition and a fair trial in admitting evidence and giving instructions, the jury found defendant guilty of negligence as bailee of plaintiff's valuable property. We are of opinion that on the record here we ought not to interfere with the verdict. Let the judgment be affirmed. All concur.