BY THE

, ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

## OCTOBER TERM, 1916.

M. B. DUGDALE, Respondent, v. ST. JOSEPH RAIL-
WAY, LIGHT, HEAT and POWER COMPANY,
Appellant.

Kansas City Court of Appeals, November 6, 1916.

1. **DAMAGES: Action for Death: Obstruction of Street: Sufficiency
of Evidence: Proximate Cause.** 'In a suit by a father for the
death of his unmarried minor son alleged to have been caused by
defendant's negligent or unlawful obstruction of the street upon
which the boy was driving a team that became frightened and was
running away, the obstruction breaking the wagon in two and
causing the boy to be thrown out and killed, the evidence is ex-
amined and *held* to be sufficient to support the father's cause of
action, and to justify a finding that the obstruction in the street
was the proximate cause of his death.

. 2. ———: ———: ———: ———: ———: **Runaway Team.** If de-
fendant either unlawfully or negligently obstructed the street, and
neither plaintiff nor deceased was guilty of any negligence con-
tributing to the latter's injury, and the death was directly caused
by the obstruction, and would not have happened but for it, then
defendant is liable, notwithstanding the fact that the team de-
ceased was driving had become frightened and ran away before
reaching the obstruction and were still running when the obstruc-
tion was reached.

3. ———: ———: ———: ———: ———: ———: **Contributory Neg-
ligence. Jury Questions.** The questions of whether the team was
wild and unruly and liable to run away, and whether plaintiff was
negligent in permitting his son to drive said team, were submitted
to the jury and their verdict disposed of those matters, there be-
ing evidence sufficient to justify the jury in their said finding.

195 M. A.] (243)

4. ————: ————: ————: ————: ————: ————: ————: Violation of Child Labor Statute. Aside from the questions whether the boy was engaged in a "gainful occupation" within the meaning of the child labor statute (Laws Mo. 1911, p. 132), and whether the act of the father, in causing his boy to work in the way he did, was a violation of the statute against child labor, or whether the statute goes so far into the relation of parent and child as to forbid a father directing his son under fourteen to do anything whatever in connection with his business, no benefit can be derived by defendant from invoking the provisions of said statute as the claimed violation of said statute was merely an independent circumstance which existed at the time of, but which had no proximate causal relation to the boy's death. The direction by the father to the boy to go upon the streets with the team was merely the occasion of his being a traveller theron. The boy's bodily presence upon the street at the point of obstruction was an essential condition of his injury but was not a cause thereof.

5. ————: ————: ————: Evidence: Admissibility. The wrongful act charged was an excavation and obstruction in the street without a written permit, in violation of an ordinance requiring same. Evidence of an oral agreement by certain of the city officers that written permits need not be obtained was inadmissible, for such officers had no power to waive enforcement of police regulations in an ordinance, and even if an estoppel could have been created in that way, no estoppel was pleaded. Such evidence was not admissible in mitigation of damages, since only compensatory damages were sought.

6. ————: ————: ————: Instructions. An instruction that if the jury found said avenue was a public street, that the surface of said street had been torn up by defendant, making it dangerous and unsafe for travel, and that obstructions had been placed by defendant in the avenue, making it unsafe and dangerous for persons driving, etc., sufficiently required the jury to find that defendant negligently obstructed the street.

7. ————: ————: ————: ————: Street Railroads: Action for Injuries: Obstruction in Street: Instruction. The instruction was not erroneous because not requiring the jury to find that defendant unlawfully tore up the street, where it was conceded that defendant did not have the written permit required by ordinance, and the jury were also instructed that, unless they found defendant either unlawfully or negligently obstructed the street, they should find for defendant, and that if the street was a public street and defendant disturbed the surface without a written permit and placed obstructions which materially obstructed and endangered public travel, then defendant unlawfully disturbed the surface of said street.

8. ———: **Excessive Verdict.** As only pecuniary loss is involved and only eight years and one month would elapse before the son would become of age, a verdict of $7500 is *held* to be excessive to the extent of $2500.

Appeal from Buchanan Circuit Court.—*Hon. Charles H. Mayer,* Judge.

AFFIRMED (*conditionally*).

*R. A. Brown* for appellant.

*Norris & Robinson* for respondent.

TRIMBLE, J.—Plaintiff, as the father and only living parent of Matthew Dugdale, an unmarried boy not quite thirteen years old, brought this suit under section 5427, Revised Statutes, 1909, for the wrongful death of his son alleged to have been caused by obstructions placed and maintained by defendant in a public street of the city of St. Joseph. He recovered judgment in the sum of $7500 and defendant has appealed.

The defendant, under a franchise from the city, operated a line of double track electric street railway south along and in the center of Lake avenue to its intersection with Alabama avenue and thence west on said last named avenue to the city limits. From the intersection of these streets east on Alabama avenue, defendant, under a franchise from the county court, operated a line of single track railway known as the Hyde Park line. At the time the franchises were granted, the territory east of Lake avenue was not in the city. Under neither of these franchises was defendant granted the right to make excavations in or obstruct Lake avenue for the purpose of putting in a track not included in either of said franchises.

About two weeks before the boy's death defendant made excavations and deposited obstructions in Lake avenue preparatory to putting in an additional track or turn so as to connect the line on Lake avenue with the Hyde Park line on Alabama avenue. It is conceded that

the part of Lake avenue east of the railway tracks, (used by the north bound traffic on the street), was thereby closed and rendered impassable; that the surface of the street, between the tracks and for a distance of eighteen inches west of the west rail, had also been excavated and that both the north and south bound traffic had to use the west side of the avenue at this point. This west side, or the space between the west curb and the track, was fourteen feet wide according to plaintiff's and sixteen feet according to defendant's evidence, and the last-mentioned distance included the excavated eighteen inches west of the west rail. Plaintiff's evidence amply tends to show that upon this western portion of the avenue were deposited piles or rather rows of excavated material, consisting of brick-bats, broken concrete, etc., and also new material consisting of broken stone, sand, etc., which piles were from two to four feet in height and extended from fifty to seventy-five feet along the street; and that only a narrow passage, varying from five to eight feet in width, was left for travel. Some of the witnesses said there was just room for one wagon to go through at a time provided it was driven carefully, and that, even in this space, rocks, brick-bats, etc., had rolled down so that the wagons would run over them. In short, the matters testified to by plaintiff's witnesses, if true, clearly show that the avenue was not reasonably safe for travel but was rendered dangerous and unsafe. Whatever the conditions there, they had been maintained for a period of from one to two weeks prior to the date of the boy's death. Defendant's testimony admits that material was piled along the place in question but says it was west of the west curb and did not extend into the space between the curb and the rail. One of its witnesses, however, said that at the time of the accident about a wheel-barrow load of fresh concrete, four or five inches high, extended out into the street about four feet from' the rail. Another said that there were two or three wheel-barrows full left in a row eighteen inches deep extending from eighteen to twenty inches west from the west rail.

On the 22nd of July, 1915, defendant told his son, the deceased, to take a wagon to the stock yards and

get some hogs he had purchased there. This wagon was a "hog-wagon" the bed of which, at the rear end at least, was only about fourteen inches above the ground. The tread of the rear wheels was about seven feet in width and wider than that of the front wheels. The wagon weighed 1600 pounds and the horses 1100 pounds each. To go to the stock yards it was necessary for the boy to go west until he got upon Lake avenue and then proceed south on it.

About a mile or more before the obstructions in the avenue were reached the horses became frightened and began running at a very rapid gait. They were still going rapidly when the obstructions were reached. At some point along the narrow passage way the wagon struck a pile of broken rock or concrete two or three feet high and broke in two, leaving the hind wheels and the body of the wagon on the rock pile and throwing the boy on to the doubletrees or front axle where he was carried for a short distance and then fell off. He was so badly injured about his head that he died almost immediately, or very shortly after help reached him.

The petition, after pleading certain ordinances, the first of which forbade the building or change of any track in the streets without permission of the Mayor and City Council, the second forbidding any franchise-owning corporation from disturbing the surface of any street without a written permit from the Board of Public Works, and the third requiring the corporation to give a bond to the city at the time of getting such permit, charged that the defendant changed the location of its track and was constructing a track in Lake avenue in violation of said first named ordinance, and, in doing so, had disturbed the surface of Lake avenue without first obtaining a permit from the Board of Public Works and giving the bond as required; that defendant thus unlawfully tore up the surface of Lake avenue and made excavations therein thereby rendering it dangerous and impassable. The petition further charged that defendant negligently placed and maintained in said avenue dangerous obstructions consisting of piles of rock, cement, stone,

bricks and other like material, making the street impassable, unsafe for travel and dangerous to persons travelling thereon; and that by reason of the condition of said avenue, the obstructions thereon and the wrongful acts and negligence of defendant, plaintiff's son was killed.

Two defenses are relied upon and they were set up in the answer, to-wit: *First,* that plaintiff negligently directed his son to drive a team known by plaintiff to be wild, unruly and of a disposition to run away, and that by reason of such disposition they ran away with the son at a point several blocks before they reached the place of injury and were still running away and were beyond the boy's control when they reached said point, and that the running away of the horses and the negligence of plaintiff in putting his son in charge of them, directly contributed to cause the injury; and, *second,* that plaintiff unlawfully employed, permitted and suffered his son to work at a gainful occupation, other than agricultural pursuits or domestic service, in violation of section 1715 of the Act of March 30, 1915, Laws of Mo. 1911, page 132.

The question of whether the team was wild and unruly and liable to run away, and whether plaintiff was negligent in permitting his son to drive said team, were submitted to the jury and their verdict disposed of that matter against defendant's contention. The evidence for plaintiff was to the effect that the horses were well broke, gentle, not vicious nor unruly and were not known to be of a disposition to run away. One of them was a family horse that the women of the family drove and which was gentle in every way. The other horse, while a blooded one, full of life and nervous, was not mean nor of a runaway disposition, nor regarded as dangerous. Upon one occasion, when harnessed with another horse and left by their driver standing unhitched, he had run away, but he had never been known to run away when anyone had hold of him. The boy had driven him many times and had driven the team in question often. No trouble had ever occurred before. The boy weighed one

hundred and twenty pounds, was large for his age and knew how to handle and drive horses well. Under these circumstances the jury could well find against defendant upon this feature of the case. That plaintiff knew, or should have known, that the team was dangerous and unmanageable was by no means conclusively shown so, as to entitle us to say, as a matter of law, that plaintiff was negligent in sending the boy with the team and wagon.

It is contended that the runaway was the proximate cause of the death. Upon this feature of the case the evidence shows that the horses became frightened long before they reached the obstructions. They were going rapidly, and, while the boy had not been able to stop them, yet for more than a mile he had maintained a partial control over them for he had properly turned the corner at the bank, had safely passed an automobile, a street car and a twenty-five-foot jog in the street; and so long as he had an unobstructed street to go on he was sitting on the seat holding the lines and guiding the team with nothing untoward happening except the fact that the horses, having been frightened, were going rapidly down the street. If the street had not been obstructed the reasonable inferences are that he would have gained complete control over the team or that they would have been stopped either upon reaching the stock yards or through fatigue. Even after the wagon was broken in two, leaving them hitched only to the front wheels and wholly free from any control, they proceeded down the street with no further mishap and were stopped and brought back to the scene of the accident very shortly after it happened. It was the striking and consequent breaking of the wagon on the rock pile that threw the boy out to his death. There was evidence that the boy was driving the team at the time the wagon struck the rock. In fact the wagon went part of the way down the narrow passageway, but before it got through, it struck the pile of rock and was broken, and this breaking took the wagon body out from under the boy and dropped or threw him upon the front axle or doubletrees and thence to the

ground causing his death. It is clear, therefore, that there was evidence from which the jury could reasonably find not only that the obstruction directly caused his death, but that he would not have been killed had it not been for such obstruction. But the defendant says that even though the obstruction did throw the boy out resulting in his death, yet the running away of the team was the *primary* proximate cause, and, therefore, before plaintiff can be allowed to recover, it must appear from the evidence that the injury would have resulted irrespective of whether the boy had lost control of his team. We do not understand such to be the rule in Missouri. If the acts of the defendant were either unlawful or negligent and had rendered the street dangerous and unsafe, and neither plaintiff nor his son were guilty of any negligence contributing to the injury, and his death was directly caused by the obstruction in Lake avenue, and his death would not have happened if it had not been for such obstructions, then defendant is liable notwithstanding the fact of the runaway. [Harrison v. Kansas City Electric Light Co., 195 Mo. 606, 623; Newcomb v. New York, etc., R. Co., 169 Mo. 469, 422; Benton v. St. Louis, 248 Mo. 98, 111; Springfield, etc., Egg. Co. v. Springfield Ice, etc., Co., 259 Mo. 664, 692; Graefe v. St. Louis Transit Co., 224 Mo. 232, 271; Vogelgesang v. St. Louis, 139 Mo. 127, 136.] [See, also, in other jurisdictions Union St. Ry. Co. v. Stone, 37 Pac. 1012, 1014; Meisner v. City of Dillon, 74 Pac. 130; Gray v. Washington Water Power Co., 68 Pac. 360.] In the Stone case, supra, the court says: "It is urged that there is no liability on the part of the railway company or the city of Winfield for the negligent defect or obstruction of the street, as the runaway team concurred in producing the injuries of Mrs. Stone. This is the rule in Massachusetts, Maine, Wisconsin, and West Virginia, but the contrary is held by the courts of New York, Pennsylvania, Georgia, Missouri, Indiana, Connecticut, New Hampshire, Vermont, and Texas. [Beach, Contrib. Neg., par. 245.] Elliott, in his recent work upon Roads and Streets, says: 'According to the weight of authority, the city is liable

where a horse takes fright, without any negligence on the part of the driver, at some object for which the municipality is not responsible, and gets beyond the control of his driver, and runs away, and comes in contact with some obstruction or defect in the road or street which the city has been negligent in not removing or repairing, if the injuries would not have been sustained but for the obstruction or defect.' '' The instructions were in accordance with the rule hereinabove stated.

Defendant's other contention is that the boy was engaged in a gainful occupation in violation of the child labor statute, above cited, which says: ''No child under the age of fourteen years shall be employed, permitted or suffered to work at any gainful occupation within this State, except at agricultural pursuits and in domestic service.''

It may very well be that if the boy was engaged in a ''gainful occupation'' within the meaning of the Act, and if the plaintiff violated the Act by employing, permitting or suffering his son to engage therein, then plaintiff should not be allowed to recover, *provided* such violation contributed to cause the boy's death and was not *merely a condition or one of the attendant circumstances* thereof.

Was the boy engaged in a ''gainful occupation'' within the meaning of the statute? The evidence shows that the boy lacked a month and a half of being thirteen; that the father had a meat packing plant in the eastern outskirts of St. Joseph; that the hogs the boy was sent after were to be slaughtered and dressed in plaintiff's plant; that during the boy's summer vacation from school the father had him around with him teaching the boy the business. The father testified that he did not employ him at the plant but, when school was not in session, he had his boy around with him in order that he might learn the business; that he couldn't say the boy had done a good deal of work around the plant. He had ''done little chores in the office, billing stuff, and running around, errands and things like that;'' that the boy could go out and buy calves, hogs, go to the stock yards;

that the father let him buy cattle, put up orders, drive the horses in delivering around to the trade; that he did not keep his boy to do anything all the time, but to learn the business; and that when the boy worked he, the father, in order to encourage him, put $2 a week in the bank for him, but that he gave him a little money when he didn't work; and that the boy did not work for him for pay or hire. One of the men employed at the plant testified that the boy didn't do much of anything around the packing house, "only monkey around there you know; didn't have no steady job around there;" that at times he had hauled cattle and hogs from the stock yards; had gone down there "once in a while." Another testified that he didn't work much around the plant, but helped "quite a little bit" when not in school, and was in school all time during school term, but at other times would often take a wagon out for his father. A boy playmate of deceased testified that he and deceased often played around the packing plant and went fishing together from there.' This was, in substance, all the testimony bearing upon the question of the boy's work.

It may be a question whether the act of the father, in causing or permitting his boy to work in the way he with a view to bringing him up with the habits of industry and training him in business, constituted a violation of the statute against child labor; or whether the statute goes so far into the relation of parent and child as to forbid a father directing his son under fourteen *to do anything whatever* in connection with his business. But passing this question, we do not think defendant can obtain any benefit from this matter. The violation of the statute, if it was a violation, was not a contributory cause of the boy's death. It was merely a circumstance which existed at the time of, but which had no proximate relation whatever to, his death. The directing of the boy to go to the stock yards and get the hogs and his obeying the direction did not cause his death. They were merely the *occasion* of his being upon the streets as a traveller thereon. His bodily presence was an essential condition of his injury, but it was not a cause thereof.

A person's violation of law'' which is merely a condition or an attendant circumstance of the injury, does not bar recovery.'' [Moran v. Dickinson, 90 N. E. (Mass.) 1151.] In Norman v. Virginia, etc., Coal Co., 68 W. Va. 405, 408, it is said: ''The true question to be determined in an action based upon a failure to obey a statute like the one under consideration is: Did the unlawful employment cause the injury? The trial of the case must be guided by this question. If the injury complained of is a natural and probable consequence of a violation of the statute, then that violation is correctly taken as the proximate cause of the injury. If the very injury has happened which was intended to be prevented by the statute law, that injury must be considered as directly caused by the non-observance of the law. But if the injury is one that happened by causes independent of the violation of the statute, it is not actionable on the basis of that violation. If an intervening event against which the statute evidently did not intend to provide, and the appearance of which was not anticipated by the spirit and purpose of the act, has in fact caused the injury, that event is plainly the proximate cause.'' This was quoted approvingly in Boesel v. Wells Fargo & Co., 206 Mo. 483. These were cases in which suit was brought against the employer based upon negligence *per se* in the violation of the statute. But they are applicable to the case at bar, for the reason that it is only on the view that plaintiff, in permitting his son to work in violation of the statute, was guilty of negligence *per se,* that we could say, as a matter of law, that his violation of the statute constituted contributory negligence and forbade his recovery.

In the case of Dickinson v. Stuart Colliery Co., 76 S. E. 654, 656, a statute forbade a minor working in a mine and made it a misdemeanor on the part of both the parent and employee to permit him to do so. A minor son was working in the mine and was killed. The father was denied relief upon the ground that the unlawful employment was the proximate cause of his son's death and *such employment* was the *only* evidence of

negligence on defendant's part and to this the father contributed by consenting to the unlawful employment. But the court said that had the death been caused by some *other* fault of the defendant, and shown to have been the proximate cause, the act of the father in consenting to the unlawful employment "could not be regarded as the proximate cause, for in that event the employment would not have been the last or causing cause."

In City of San Antonio v. Ashton, 135 S. W. 757, 760, a hack driver had stationed his hack at a place prohibited by ordinance and was transacting his business there in violation thereof. He went from his hack to a telephone and, in returning to his hack, was injured by a defect in the street. The court held that there was no connection between the injury and the violation of the ordinance.

In Smith v. Marion Fruit Jar and Bottle Co., 84 Kan. 551, it was held that a violation of a statute which was not the proximate cause of the injury, but which "at most merely produced a condition that made the accident possible" could not be regarded as constituting contributory negligence. [See, also, Nickey v. Stender, 164 Ind. 189, 73 N. E. 117; Hughes v. Atlanta Steele Co., 136 Ga. 511; Malloy v. American Hide & Leather Co., 185 Fed. 776; Blackburn v. Southwest Missouri R. Co., 180 Mo. App. 548.].

If it be said that recovery should be denied, not upon the ground of contributory negligence, but upon the theory that plaintiff, having exposed his son to danger in violation of the statute, will not be allowed to take advantage of his own wrong, the answer that unless the injury was connected with the alleged violation in some sort of a *causal* relation, the father is not taking advantage of his own wrong. The situation is not that at all. There being no causal relation between the father's alleged violation of the statute and his son's injury, the true situation is that the defendant is seeking to escape the results of its own wrongful and negligent acts by pointing out an alleged wrongful, but independent, act of

the father.   To permit the defendant to escape liability, under the circumstances, and on the theory advanced in this case, would allow defendant, by either an unlawful or negligent act, to kill the plaintiff's boy without civil liability, whereas, if plaintiff had been a farmer instead of in the meat packing business, he would be allowed to recover.  And yet the occupation of plaintiff had nothing to do with causing the boy's injury.

At the trial there was no question but that the defendant had failed to obtain a *written* permit from the Board of Public Works.   The defendant placed its general manager on the stand and asked him if at any time prior to the happening of this accident he ever had an *oral* agreement with the Board of Public Works to the effect that he need not take out permits to do work on the defendant's tracks.  He was also asked if there was not an oral agreement that it was not and would not be necessary to obtain permits in making repairs and improvements on the tracks and in the streets; also as to the custom of the defendant with reference to taking out permits to do such work; and whether at any time in the last five years, he had ever at any time been required to to take out any permits to do work on the track. These questions were all objected to and the objections were sustained.  The exclusion of this evidence is complained of as erroneous.

The petition alleged a violation of the ordinance requiring a *written* permit, and one of the causes of action therein stated was based on such violation.  The answer did not plead a waiver of the enforcement of the ordinance by the city, nor did it plead any verbal authority given by the Board.  It would seem that if the Board of Public Works could waive the police regulations of an ordinance, or could in that manner create any sort of an estoppel by failing to enforce them, such waiver and estoppel should have been pleaded.  However, the city charter gives to the *Mayor and Council* the power of regulating and controling, *by ordinance,* the use of franchises, (Sub. 7, sec. 8588, R. S. 1909), and the power to control streets and to prevent or remove obstructions

thereon. [Sub. 12 of said sec. 8588.] The ordinance requiring a written permit affected the safety and well being of the public as well as of the city and was, therefore, a police regulation. [Westport v. Mulholland, 159 Mo. 89.] The Board of Public Works had no power to waive obedience to the ordinance. Defendant knew the Board had no such power. Hence there can be no estoppel arising out of the violation of the ordinance. [Mullins v. Kansas City, 188 S. W. 193, 196.]

But, it is claimed that at any rate the evidence of oral permission should have been admitted in mitigation of damages. This is upon the theory that as section 5427 authorizes the jury, in fixing the damages, to consider not only what would reasonably compensate a plaintiff for the death, but also to have "regard to the mitigating and aggravating circumstances attending such wrongful act, neglect or default," therefore, under this statute and the evidence in the case, the jury might think and did think they could allow punitive damages. But the jury were instructed in reference to compensatory damages only. They were not told that they could add anything thereto because of any aggravating circumstances. The instruction on measure of damages is as follows: "The court instructs the jury that if you find for the plaintiff you shall assess his damages, if any, at such a sum as you may believe from the evidence will reasonably compensate him for the death of his son, as you may deem fair and just under the evidence in this case, *with reference to the necessary pecuniary injury to him resulting therefrom,* if any, as shown by the evidence, not exceeding ten thousand dollars." This was an instruction on compensatory damages only. The instruction followed the language of the statute as to compensatory damages, and was sufficient. If defendant thought the instruction needed qualification so as to exclude any possible thought of punitive damages in the minds of the jury, it should have asked an instruction of that nature. [Taber v. Missouri Pac. R. Co., 186 S. W. 688, 693.] It cannot be assumed by us that the jury went beyond the instruction.

It is said that plaintiff's instruction No. 1 is erroneous in that it failed to require the jury to find either that defendant *wrongfully* tore up the street or *negligently* obstructed 'it. The instruction, among other things, said to the jury that "if you find from the evidence that said avenue was a public street in said city, and that the pavement in said avenue and the surface of said street had had been torn up by said defendant, and that said avenue had been made thereby dangerous and unsafe for travel thereon, and that obstructions in said avenue had been placed by said defendant, and that said obstructions made said avenue and street not reasonably safe for public travel and dangerous for persons driving over the same, and if you further find," etc. We think the instruction did require the jury to find that the defendant negligently obstructed the street although the word "negligently" was not used. It would seem also that this section is based wholly on negligence, but, if it is based also upon an *unlawful* tearing up of the street, there was no controversy in the evidence over the fact that defendant tore it up without a written permit as required by the ordinance. By seeking to justify its act on the ground of an oral permit, the defendant admitted it had no written one. Besides, defendant's instruction No. 3 told the jury that unless they found that defendant either unlawfully *or* negligently obstructed the street, their verdict must be for defendant. Plaintiff's instruction No. 3 told the jury that if they found the street to be a public street and that defendant disturbed the surface thereof without a written permit from the Board of Public Works, and that in so doing, obstructions were placed in said street and that they materially obstructed and endangered public travel thereon, then defendant unlawfully disturbed the surface of said street. The jury, therefore, were not left to guess what would constitute an unlawful disturbance of the street. And if defendant *unlawfully* excavated in said street and placed obstructions therein rendering it dangerous, then it would seem that the question of the care it used—i. e. its negligence, would be

195 M. A.—17

immaterial. [Hill v. Union Electric, etc., Co., 260 Mo. 43, 108; Pittsburg, etc., R. Co. v. Hood, 94 Fed. 618.]

Finally, complaint is made of the verdict as being excessive. In this case it is only the damages for the necessary *pecuniary* injury resulting from the death that can be awarded. Nothing in the way of *solatium*, or damages for injury to the feeling, can enter into it. Nor, as we have seen, was anything in the way of punitive damages authorized. Consequently, it is only the father's *pecuniary* loss that is involved, and he can have no pecuniary interest in his son's services after the latter is twenty-one. So that such value can be only for the eight years and one month that would have elapsed before the son became of age. Is $7500 for that period excessive?

The evidence is that this was a rather extraordinary boy, very ambitious, very smart, weighed one hundred and twenty pounds, large of his age and healthy, industrious and of good habits. He could go out and buy cattle and hogs, and, with his disposition to learn, would no doubt have become of valuable assistance to his father. And yet, to equal this verdict he would have had to be worth nearly $1000 a year to his father over and above the cost of education and keep. Indeed, he would have to earn more than that in order to make the *present value* of such services worth the amount of the verdict. The petition alleged he was earning $2 per day, but the father testified that when he worked he put $2 a week in the bank to encourage him. If he had earned $2 per day it would only amount to $600 per year, though, of course, when older he might earn more than that. This increase, however, would be more than offset by the expenses of his education and keep. Under the circumstances we do not think there can be any question but that the pecuniary value of the son to his father during minority would not exceed $5000 and that that sum is a fair, liberal and just amount to be awarded for the loss. The verdict is, therefore, excessive to the extent of $2500. If the plaintiff will, within ten days from the announcement of this opinion, enter a remittitur of that amount with the in-

terest thereon, the judgment will be affirmed, otherwise it will be reversed and the cause remanded. It is so ordered. The other judges concur.